George H. HILL, Plaintiff-Appellant,

v.

The SHARPLES CORPORATION,
Defendant-Appellee.

No. 327, Docket 24317.

United States Court of Appeals
Second Circuit.

Argued June 4, 1957.

Decided Aug. 8. 1957.

Austrian, Lance & Stewart, New York City (Maurice Rosenberg, Melvin Kraft, New York City, of counsel), for plaintiff-appellant.

Sullivan & Cromwell, New York City (Inzer B. Wyatt, Andrew N. Heine, New York City, of counsel), for defendant-appellee.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

The plaintiff-appellant, George H. Hill, appeals from a judgment in favor of the defendant, The Sharples Corporation, dismissing the plaintiff's complaint after trial before a judge and jury. The complaint contained three counts: first, for contract damages resulting from the failure of the defendant to pay Hill, who had been employed by Sharples, $177,000 in substitution for commissions allegedly earned by Hill in 1942 but retained by

the defendant; second, for damages in fraud for actionable misrepresentations by which Sharples' officers allegedly induced Hill to consent to retroactive cancellation of the written employment agreement under which he had earned the claimed commissions; and third, for equitable rescission and an accounting on the same grounds of fraud as set forth in the second count. Federal jurisdiction was based on diversity of citizenship.

The defendant manufactures purifying machinery used on ships and submarines to clean the oil in both the lubricating and fuel systems. Hill began working for Sharples in 1925 and remained in its employ until his retirement in 1951. Throughout his employment he was a "sales engineer," whose duties included selling and servicing centrifugal purifying equipment to naval architects, marine engineers, shipowners, and shipbuilders.

In January 1940, the plaintiff and the defendant executed a written contract covering Hill's employment. It provided for a monthly salary of $400, and stated that the "salary shall be subject to change by" the defendant alone. Further provision was made for a "yearly bonus" consisting of commissions to be computed according to the amount by which orders for sales and service from Hill's territory exceeded a specified quota based upon expenses. The contract also contained the following clause:

"Cancellation of this agreement by either party shall not affect the compensation due Hill under this agreement for business done prior to the effective date of cancellation."

In 1940 and 1941, the sudden increase in shipbuilding created a fast-rising demand for the defendant's products. As a result, in 1940 the plaintiff's total compensation was $29,286.49, almost treble his compensation for 1939. Of this amount only $4800 represented salary. Hill's contract was renewed for the year 1941, and in that year his total income was $82,598.77—the highest in Sharples' organization, except for Mr. Sharples

himself, the defendant's president. In the first two months of 1942 sales orders in Hill's territory continued to rise in volume. Nevertheless, in March Hill's contract was renewed for the year 1942 without any change in its existing terms.

On April 28, 1942, the Renegotiation Act of 1942, 50 U.S.C.A.Appendix, § 1191, was approved by the President, and became effective. That statute required the renegotiation of the contract price in all war contracts in order to eliminate "excessive profits." The determination of "excessive profits" was to be made by the Secretary of each Department. Contractors were required to disclose to the Secretary "actual costs of production and such other financial statements * * * as such Secretary may require." No "excessive profits" could be paid and, if any had already been paid, an action for recovery was authorized. The Renegotiation Act contained a specific direction that, in determining "excessive profits," no allowance should be made for "any salaries, bonuses, or other compensation paid by a contractor to its officers or employees in excess of a reasonable amount."

Sometime after the enactment of the Renegotiation Act, the War Department and the Navy Department jointly published an official booklet (colloquially called the "Green Book") setting forth the "Principles For Determination of Costs Under Government Contracts." That publication provided, *inter alia*, that "the total compensation paid to individual officers and employees of the contractor may be open to question and subject to limitation when the circumstances warrant * * *" Illustrative circumstances included total compensation to any individual "in excess of $25,000 per annum," particularly "when such compensation has been increased disproportionately or unreasonably since June 30, 1940." Among the items designated as "inadmissible costs" were "commissions, bonuses, and special premiums under whatever name, paid in connection with negotiations for or procurement of a Government contract."

The issuance of this publication was reported by the New York Times on June 21, 1942, in an article captioned "War Contracts get $25,000 Salary Limit." The text of the article contained a condensed, but generally accurate description of the contents of the "Green Book." At the trial below, G. Joseph Keady, who was Executive Vice President of Sharples in 1942, testified that he read this article in the Times at the time of its appearance. He also testified that during the preceding months he had read several articles in that newspaper reporting attempts by the President and several committees of Congress seeking to impose restraints upon war-stimulated incomes. The witness then testified that he became disturbed about the defendant's contract with Hill and the possibility of commissions accruing under it far in excess of the general limits of reasonable compensation prescribed by the Renegotiation Act and the "Green Book." Of course, under the directions of the latter no commissions whatsoever "paid in connection with negotiations for or procurement of a Government contract" were allowable as cost items in the computation of a contractor's costs under a Government "cost-plus" contract.

Sometime during the latter part of June or early July, 1942, Keady, by prearrangement, met Hill at the Biltmore Hotel in New York City. Attempts by counsel to establish the precise content of their ensuing conversation consumed the bulk of the trial proceedings, inasmuch as that conversation comprised the principal basis of the plaintiff's claims for relief both at trial and on appeal.

Keady testified that at this meeting he told Hill that the Sharples' management had decided "to pay [Hill] the maximum amount that we could under the Renegotiation Act, which was $25,000 a year. Anything in excess of that would be looked at askance by the Renegotiation Board." The plaintiff's recollection of Keady's remarks, made fourteen years before the trial, was as follows:

"Well, the conversation was to the effect that Mr. Sharples was acquainted of an [imminent Government] investigation and he did not want the company hurt * * * then he [Keady] told me that it [the investigation] had something to do with my commissions and that the law would not allow them [the defendant] to pay me more than $25,-000 a year, therefore they were going to cancel my 1942 contract and * * * put me on a $25,000 a year salary for that year of 1942 * * * "

Hill, according to his testimony, then replied that he "didn't want to have Mr. Sharples embarrassed by any Government investigation and if the law wouldn't allow me to be paid more than $25,000 * * * I guessed I would have to accept it." The plaintiff also testified that he mentioned the "commissions that the company owed me, and he [Keady] told me that they would be held and paid to me at a later date."

Several weeks after the Biltmore meeting, Hill received a letter from the defendant's treasurer, which read as follows:

"We hereby cancel your contract under which you are now working; this cancellation to be effective as of January 1, '42. We will pay you a salary for the year 1942 in the amount of $25,000. The above arrangement will extend to December 31, '42, and will be again reviewed at that time.

"Please indicate your acceptance of this proposition."

The plaintiff accepted the cancellation of the old agreement and the substitution of the new, and continued to work for Sharples throughout the war at a salary of $25,000 per year.

At the end of World War II in 1945, when orders for the defendant's products began to decline, Hill was notified that the terms of his compensation would revert to the pre-war system of salary plus

commissions or "bonuses." The plaintiff then called to the attention of the Sharples' management the fact that he was still owed certain commissions for the years 1940 and 1941. A settlement of this claim was reached on December 28, 1945, and Hill was paid $13,462.53. It was stipulated by counsel below that no reference was made at that time to any claims for commissions accruing under Hill's original contract for 1942—the year here in issue.

The plaintiff continued to work for Sharples on the pre-war basis of compensation until his retirement in 1951. His highest annual income for any year subsequent to 1945 was $23,000 in 1948; his compensation for the other post-war years was considerably less than that amount.

In 1954, after a conversation with a friend, Hill consulted a lawyer, who arranged a conference with Mr. Sharples, the defendant's president. Hill testified that at this conference Mr. Sharples disclosed that although "it might not have been illegal" to pay Hill more than $25,-000 in 1942, "it would have been against the best interests of the company." On February 3, 1955, the plaintiff instituted this action.

At the conclusion of the trial the District Court submitted a special verdict to the jury requesting answers to many special questions. On the basis of the answers to these questions, the trial court directed a verdict for the defendant on the first two counts. Subsequently the court dismissed the third count, the non-jury action for equitable rescission. The court, in directing a verdict of dismissal on count one, held that the promise made by Keady to Hill, to the effect that "the defendant would take care of the plaintiff," was too indefinite to be enforceable. See Varney v. Ditmars, 1916, 217 N.Y. 223, 111 N.E. 822; Chiapparelli v. Baker, Kellogg & Co., 1929, 252 N.Y. 192, 169 N.E. 274; Bogy v. Berlage, 1st Dept. 1942, 265 App.Div. 249, 38 N.Y.S.2d 584. In directing a verdict for the defendant on the second count—seeking damages for fraud—the court pointed out that although the jury

found that Keady represented to Hill in their Biltmore meeting that it would be "unlawful" for the defendant to pay Hill more than $25,000 for the year 1942, the jury also found that Keady believed this representation to be true at the time of its making. The court then ruled that Hill had failed to prove "scienter," an essential element of a claim sounding in "actual fraud."

In a subsequent opinion the trial court discussed the third count—an equitable action for rescission. It ruled that "the [Biltmore] representation having been made and not being true, it constituted a 'constructive fraud,' even though the defendant's officer [Keady] had no intention to make a fraudulent representation, even though he had no knowledge that what he was saying was false and even though he believed it to be true," citing Knight v. Kitchin, 1933, 237 App.Div. 506, 261 N.Y.S. 809; Moses v. Carver, 1937, 164 Misc. 204, 298 N.Y. S. 378, affirmed 254 App.Div. 402, 5 N. Y.S.2d 783. The trial court stated that "constructive fraud" provides the basis for rescission and an accounting, but that section 53 of the New York Civil Practice Act, a ten-year statute of limitations, is applicable to such actions. Hearn 45 St. Corp. v. Jano, 1940, 283 N.Y. 139, 27 N.E.2d 814, 128 A.L.R. 1285; Buttles v. Smith, 1939, 281 N.Y. 226, 22 N.E.2d 350; Pitcher v. Sutton, 4 Dept. 1933, 238 App.Div. 291, 264 N.Y.S. 488. That statute begins to run from the time when "the cause of action accrues"—here July 1942, the date of the cancellation agreement. Hence the trial court dismissed count three, holding that it was barred as of July 1952, almost three years before the institution of this suit.

On appeal the plaintiff does not press the claim for contract damages contained in the first count. He still contends, however, that he is entitled to a rescission of the cancellation agreement of July 1942 on the ground of "actual fraud," and to an accounting by Sharples for commissions due under the original contract for that year. In the alternative, the plaintiff seeks judgment for fraud on the second count in the amount

of $103,700 (reduced at trial from the original claim of $177,000) allegedly representing Hill's commissions for the first six months of 1942, as reduced to take account of canceled orders and the excess salary over his original contract paid to him in 1942.

We affirm the judgment of the District Court dismissing the plaintiff's complaint. After an examination of the record below, we are not prepared to set aside the crucial jury findings, nor do we believe that the trial court committed any error in the construction and application of the governing New York law.

In answer to two of the questions submitted to it, the jury found (1) that Keady represented to Hill at their Biltmore meeting that it would be "unlawful" for the defendant to pay Hill more than $25,000 a year for the year 1942, and (2) that, at the time of its making, Keady believed this statement to be true.[1]

█ In order to sustain his position on appeal, the plaintiff would have us accept the jury's answer to the first of these questions, but reject its answer to the second as unsupported by the evidence adduced below. But an appellate court may not readily make such a selection. Where the evidence presented at trial is susceptible of several conflicting inferences, we cannot disturb a jury verdict based on an inference reasonably drawn from that evidence, even though we, were we sitting as triers of fact, might have found otherwise. Moore v. American Scantic Line, Inc., 2 Cir., 1941, 121 F.2d 767; Alexander, Ramsay & Kerr, Inc., v. National Union Fire Ins. Co., 2 Cir., 1939, 104 F.2d 1006.

█ The plaintiff argues that the record does not support the jury finding that Keady, in 1942, believed that it

would be "unlawful" for the defendant to pay Hill more than $25,000 for that year. Our attention has been directed to Keady's testimony on cross-examination where he said, in reference to the legal limits on Hill's income for 1942: "We could have paid him $100, if we wanted to, or a million." This statement was made, however, almost fourteen years after the Biltmore conversation. The jury might have inferred that Keady's understanding of the Renegotiation Act was substantially more comprehensive in 1956 than in 1942. Indeed, there was independent evidence to support such a conclusion. As we noted above, Keady testified that during the spring of 1942 many stringent proposals for limiting wartime incomes had come to his attention through articles in the New York Times. He also testified that he read an article in that newspaper on June 21, 1942—only a few days before the Biltmore meeting—under the misleading caption "War Contracts Get $25,000 Salary Limit." The plaintiff argues that a close reading of the text of the article would have revealed that the only penalty for "unreasonable" compensation earned incident to war contracts was disallowance of the excess as a cost item under such contracts. However, the jury, as a group of twelve laymen, might have concluded that Keady, who had had no legal training, construed this article, in the context of previously reported salary limitation proposals, to mean that the defendant could not legally pay Hill over $25,000 for the year 1942. In any event, we are not prepared to say that such an inference was clearly unreasonable. Hence the element of "scienter," essential to recovery for "actual fraud," was not established by the plaintiff. Consequently, whatever right to recovery the plaintiff might have had was time-barred as of July 1952.

---

1. Among the special questions the judge submitted to the jury in the special verdict, and the answers the jury gave, were the following:

"Did Keady make any representation to Hill in late June or early July 1942 at the Biltmore Hotel that it would be un-

lawful for the defendant to pay Hill more than $25,000 a year for the year 1942? Answer 'Yes' or 'No.' Yes.

"If Keady made any such representation, did Keady actually believe it to be true? Answer 'Yes' or 'No'. Yes."

Since we reject the plaintiff's efforts to set aside the jury finding relative to the "scienter" issue, and adopt the trial court's construction of the New York law applicable to "constructive fraud," we need not discuss the other arguments on appeal.

Judgment affirmed.